DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# SHOPPING CENTER LEASE

THIS SHOPPING CENTER LEASE ("Lease"), made this <u>May 6, 2022 | 9:30 AM EDT</u> (the "Effective Date") by and between **WHLR–PIERPONT CENTER, LLC**, a Delaware limited liability company (hereinafter called "Landlord"); and **Davis Kitchen & Tile, LLC** a West Virginia (hereinafter called "Tenant").

WITNESSETH:

1.  <u>Basic Lease Provisions and Definitions</u>.  The following capitalized terms whenever used in this Lease shall have the meanings set forth in this Section 1:

| | | |
|---|---|---|
| (a) | <u>Landlord's Mailing Address</u>: | **WHLR–PIERPONT CENTER, LLC**<br>c/o Wheeler Real Estate Company<br>2529 Virginia Beach Boulevard<br>Virginia Beach, VA 23452 |
| (b) | <u>Tenant's Mailing Address</u>: | **Davis Kitchen & Tile, LLC**<br>831 Venture Drive<br>Morgantown, WV 26508 |
| (c) | <u>Agent/Agent's Mailing Address</u>: | For purposes of this Lease, "Agent" shall be defined as, Wheeler Real Estate Company<br>2529 Virginia Beach Blvd<br>Virginia Beach, VA 23452 |
| (d) | <u>Rental Payment Address</u>: | **WHLR–PIERPONT CENTER, LLC**<br>c/o Wheeler Real Estate Company<br>2529 Virginia Beach Boulevard<br>Virginia Beach, VA 23452 |
| (e) | <u>Shopping Center</u>: | Pierpont Centre Shopping Center, having an address of 601 Venture Dr., Morgantown, WV 26508 and shown on the site plan attached as <u>Exhibit "A"</u> to this Lease. |
| (f) | <u>Premises</u>: | Store Number 3 in the Shopping Center, such Premises consisting of an agreed upon square footage of leasable area of 2,646 square feet.  The Premises is outlined in red or otherwise designated on <u>Exhibit "A"</u>.  Landlord and Tenant agree that the agreed upon approximate number of square feet of leasable floor area contained in the Premises shall be deemed to be the actual number of square feet of leasable floor area unless Landlord obtains or performs a measurement of the leasable area of the Premises within thirty (30) days after the Commencement Date in which event the measurement obtained or performed by Landlord shall be used as the leasable square footage of the Premises for all purposes including, without limitation, the calculation of Minimum Rent and Tenant's Fractional Share.  If no such measurement is obtained or performed by Landlord then the agreed upon square footage set forth above shall be deemed to be the actual square footage of the Premises for all purposes. |
| (g) | <u>Term</u>: | An original lease term of five (5) years (the "Original Term"), subject to the terms and conditions set forth herein. |
| (h) | <u>Permitted Use</u>: | The Premises shall be used for the sale of kitchen cabinets and related fixtures, floor coverings, and related items and for no other purpose without Landlord's prior written consent. |

1

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

Tenant shall not operate in any manner which would violate the exclusives and restrictions of the Shopping Center, in effect as of the date of this Lease.

(i)      Trade Name:                     Davis Kitchen & Tile

(j)      Minimum Rent:                   Minimum Rent shall be as set forth below:

| LEASE YEAR | ANNUAL MINIMUM RENT - PER SQUARE FOOT | ANNUAL MINIMUM RENT - TOTAL | MONTHLY MINIMUM RENT |
|---|---|---|---|
| 1 | $16.58 | $ 43,870.68 | $ 3,655.89 |
| 2 | $16.58 | $ 43,870.68 | $ 3,655.89 |
| 3 | $17.08 | $ 45,193.68 | $ 3,766.14 |
| 4 | $17.59 | $ 46,543.14 | $ 3,878.60 |
| 5 | $18.12 | $ 47,945.52 | $ 3,995.46 |

(k)      Percentage Rent:                Intentionally Deleted

(l)      Estimated Initial Tenant Charges:    Amounts equal to **$0.92** per square foot for **Operating Costs**, **$0.66** per square foot for **Real Estate Taxes** and **$0.98** per square foot for **Insurance Charges**; a total amount equal to **$2.56** per square foot, which is equal to $6,773.76 per year and $564.48 per month, subject to reconciliation and adjustment in accordance with Section 10.

(m)      Security Deposit:               $2,646 currently on file.

(n)      Guarantor Name & Address:       Christopher Collins
                                         1213 Muriel Street
                                         Orlando, FL 32806

(o)      Confidentiality Clause:         It is understood and agreed that the term and conditions of this Lease between the Landlord and the Tenant shall remain confidential. Tenant, its principals, employees and representatives shall not discuss the terms, rates, or conditions with any third party unless authorized by or requested to do so by the Landlord. Any breach of confidentiality by the Tenant shall be deemed a material default hereunder and which the Landlord, at its option, may take action as described in Section 25 of this Lease.

2.      Premises.  Landlord leases to Tenant, and Tenant leases from Landlord, the Premises, subject to the terms and conditions of this Lease.

3.      Term.

        (a)      The Term of this Lease shall commence upon June 1, 2022 (the "Commencement Date"). Minimum Rent and Additional Rent (as defined below) shall commence upon the Commencement Date (the "Rent Commencement Date").  The Term of this Lease shall expire upon the last day of the sixtieth (60th) month following the Rent Commencement Date (the "Expiration Date").

        (b)      Landlord shall deliver written notice to Tenant of its delivery of the Premises to Tenant ("Delivery Notice"). Delivery of the Delivery Notice to Tenant shall be conclusive evidence of Landlord's delivery of the Premises to Tenant and completion of all conditions precedent to delivering the Premises to Tenant, including, but not limited to, completion of Landlord's work in the event Landlord is required to complete any Landlord Work. If Tenant is

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

unable to obtain possession of the Premises at the beginning of the Term hereof due to any act or condition such as Landlord construction delays or the failure of the prior tenant to vacate the Premises, Landlord shall not be liable to Tenant or any other person, firm or corporation for any loss or damage resulting therefrom, and this Lease shall not be affected thereby in any way, but the Rent payable hereunder shall be proportionately abated until the Premises are available for occupancy by Tenant.

(c)     Tenant agrees, not later than ten (10) days following the request of Landlord, to execute and deliver to Landlord, without charge, a written declaration, in a form similar to Exhibit "B":  (i) ratifying this Lease; (ii) confirming the commencement and expiration dates of this Lease; (iii) certifying that Tenant is in possession of the Premises and the date Tenant commenced operating Tenant's business therein; and (iv) that all conditions under this Lease to be performed by Landlord have been satisfied, except such as shall be stated.

(d)     Except where the context clearly requires otherwise, the words "Term" or "term", whenever used in this Lease with reference to the term hereof, shall be construed to include any renewal term, as well as the original term.  The words "Lease Year" as used in this Lease shall be construed to mean each twelve (12) month period commencing upon the Commencement Date and expiring upon the last day of the twelfth (12th) full month following the Commencement Date.

4.     Condition of the Premises.  It is understood and agreed to by Landlord, Tenant and Agent that Tenant is accepting the Premises in its present condition, except as otherwise set forth on Exhibit "G-2".  If Tenant desires to make any improvements to the Premises, the improvements shall be done at Tenant's sole cost and expense, subject to the provisions of Section 16.  Tenant shall not undertake any improvements to the Premises without prior written permission from the Landlord and all approved improvements shall be completed by a licensed, insured and pre-approved contractor with all necessary permits and inspections performed. Subject to other provisions contained herein.

5.     Use.  Tenant agrees that the Premises shall be used solely for the Permitted Use and for no other purpose.  Tenant covenants that at all times during the term hereof Tenant will actively conduct such a business in the Premises, keep the Premises amply stocked and keep the Premises open for business during customary business hours (not less than eight (8) hours per day, Monday through Saturday) of the Shopping Center as established or as may be amended by Landlord.  Tenant agrees to operate its business under the Trade Name and no other name without the prior written consent of Landlord.  Tenant shall not use the Premises for any illegal, immoral or unethical uses and shall comply with all applicable local, state and federal ordinances and regulations governing such use.

6.     Rent.

(a)     From and after the Rent Commencement Date, Tenant covenants to pay Minimum Rent and all Additional Rent, as hereafter defined, without notice or demand, and without deduction or offset and shall be payable on the first day of each month, in advance, in equal monthly installments. Rent for any partial months of the Term shall be prorated on a daily basis.  The term "Rent" shall include Minimum Rent, Tenant Charges (as defined in Section 10) and any and all other charges and amounts (collectively "Additional Rent") due to Landlord under this Lease. All payments of Rent shall be paid to Landlord at the Rental Payment Address, or to such other party and/or at such other address as Landlord may from time to time designate in writing.  Landlord reserves the right to report all delinquent accounts to any major credit report agency.

(b)     Tenant shall deposit the Security Deposit and the first month's Rent with Landlord upon signing this Lease as security for Tenant's full and faithful performance of all of Tenant's obligations under this Lease.  Landlord shall not owe any interest on the Security Deposit to Tenant, and Landlord may commingle the Security Deposit with Landlord's other funds, unless otherwise required by law in each instance.  The Security Deposit will be returned to Tenant after the expiration of this Lease, provided that Tenant has fulfilled all of its obligations under this Lease.  Landlord shall be entitled to use the Security Deposit for curing any defaults under this Lease by Tenant.  Tenant agrees to maintain the Security Deposit at all times at the full amount set forth in Section 1(m).  Furthermore, upon Landlord's sale of the Shopping Center and the assignment or delivery of the Security Deposit to the purchaser, Landlord shall not have any further liability to Tenant for the return of the Security Deposit. The first month's Rent will be applied to the Rent due on the Rent Commencement Date.

(c)     Within ten (10) days after the end of each calendar month during the term, Tenant shall deliver to Landlord without demand, a statement signed and certified by Tenant (if Tenant is a corporation or partnership, signed and certified by one of Tenant's officers or general partners, as appropriate) to be true and correct, showing the Gross Sales made during such month.  Within twenty (20) days after the end of each Lease Year, Tenant shall deliver to Landlord, without demand, a statement, signed and certified as above to be true and correct, showing the Gross Sales made during such Lease Year, and within three (3) months after the end of each Lease Year, Tenant

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

shall deliver to Landlord, without demand, a confirmatory (or amended, if necessary) statement certified by a Certified Public Accountant.  In no event shall Landlord be construed or held to be a partner or an associate of Tenant in the conduct of its business, nor shall Landlord be liable for any debts incurred by Tenant in the conduct of its business. In addition to any and all other remedies provided in this Lease and/or by law and/or by equity, Tenant agrees to pay Landlord a flat sum of One Hundred Dollars ($100.00) each and every time Tenant does not furnish Landlord with Tenant's monthly or annual statement of Gross Sales as required and within the time specified in this Section 6 (c). Landlord has the right, at its expense, to independently audit Tenant's Gross Sales.  Should Landlord find it necessary to do so, Tenant will fully cooperate with Landlord and its agents in connection with its audit, including, but not limited to providing Landlord with access to Tenant's files and records.

(d)       The term "Gross Sales" means the selling price of all merchandise sold or delivered at, in, on or from the Premises (including without limitation sales by means of any mechanical or vending device) and the charges for all services of any sort performed in, at or from any part of the Premises or arising out of the use of the Premises. Gross Sales shall include all sales and charges for cash, credit or otherwise, regardless of collection of payment.  A sale shall be deemed to be made in the Premises if an order is secured or received in the Premises, whether or not such order is filled in the Premises or elsewhere, or if orders are received or filled at or from the Premises.  All monies or other things of value not specifically excluded from Gross Sales under this Lease shall be deemed included therein.  However, Gross Sales shall specifically exclude (i) returns and refunds made by Tenant relating to transactions previously included within Gross Sales; and (ii) amounts collected and paid by Tenant to any governmental authority for any sales or excise tax.  The full amount of all "layaway", C.O.D. sales and the like shall be taken into Gross Sales when originally made.

(e)       Tenant recognizes and acknowledges that if Rent payments are not received when due, Landlord will suffer damages and additional expenses thereby, and Tenant therefore agrees that a late charge equal to ten percent (10%) of the late Rent (including Minimum Rent, and Additional Rent) may be assessed by Landlord as additional rent if Landlord has not received any monthly installment of Rent due pursuant to this Lease within five (5) days after its due date.  In addition, Tenant agrees to pay interest at the rate (the "Default Rate") of eighteen percent (18%) per annum, payable monthly or One Hundred and 00/100 Dollars ($100.00), whichever is greater, on all Rent (including Minimum Rent, and Additional Rent) from the time said Rent accrues if not paid promptly when due, Landlord expressly reserving all other rights and remedies provided herein or by law with respect thereto. Further, on any checks or payments returned to Landlord for any reason whatsoever, Tenant shall be charged a return fee equal to $150.00 for each occurrence.

7.       **Shopping Center Operating Costs.  Tenant shall pay to Landlord as Additional Rent, in accordance with Section 10 below, a share of the Shopping Center "Operating Costs." "Operating Costs" shall mean the total costs and expenses incurred by Landlord in operating, maintaining, repairing, insuring and managing the Shopping Center and Common Areas, including without limitation the cost and expense of landscaping, gardening and planting; decorations; paving, patching, painting and line painting of all parking areas, drives and roadways; Common Area maintenance and cleaning, sanitary control, snow removal and trash, garbage and other refuse removal, including costs related to common trash dumpsters and compactors; repair, maintenance, replacement and painting of sidewalks, pavements, light fixtures, signs, roofs, roof skins and downspouts; repair, maintenance and painting of buildings; pest control; general repairs; fire protection (including sprinkler system repairs and maintenance for non-exclusive tenant use) and security services (if provided by Landlord, it being agreed that Landlord has no duty to provide such services); reasonable and appropriate reserves (including, but not limited to, reserves for the replacement of utility systems owned by Landlord); costs of all types of insurance coverages carried by Landlord for the Shopping Center (and the amount of any deductibles with respect to claims made against such coverages); maintenance, repair and replacement of utility systems serving the Shopping Center (whether or not owned by Landlord); costs of lighting and other utilities serving the Common Areas; storm water fees; depreciation of machinery and equipment owned and used in operation, maintenance and repair of the Common Areas, or the rental charges for such machinery and equipment; the cost of personnel (including customary employee benefits) to implement all of the foregoing, including maintenance, security and traffic personnel; and management fees.  Landlord may cause any and all of the aforesaid services relating to Operating Costs to be provided by an independent contractor or contractors.  Tenant shall also be responsible for the payment of all common area maintenance expenses and similar charges due with respect to the Premises under that certain Reciprocal Easement and Use Restriction Agreement (Monongalia County, West Virginia) dated September 22, 1998 by and between Glenmark Holding Limited Liability company and Lowes Home Centers, Inc., including all amendment, assignments, or modifications thereto (collectively, as amended, assigned, or otherwise modified, the "REA") governing certain matters related to the Shopping Center.**

**Tenant's share of Operating Costs shall be computed by multiplying the total amount of the Operating Costs by a fraction ("Tenant's Fractional Share"), the numerator of which shall be the total number of square feet of**

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

leaseable area in the Premises, and the denominator of which shall be the total square footage of all leasable buildings in the Shopping Center. Tenant's share of Operating Costs shall be paid in accordance with Section 10 below.

8.    **Taxes**.  Tenant shall pay to Landlord as Additional Rent, in accordance with Section 10 below, a share of Real Estate Taxes, which shall be computed by multiplying the total amount of Real Estate Taxes by Tenant's Fractional Share.  The term "Real Estate Taxes" shall mean all taxes and assessments (special or otherwise) levied or assessed directly or indirectly against the Shopping Center (other than Excluded Parcels that are separately assessed for real estate tax purposes, but specifically including the parcel currently operated by Michaels Stores, Inc.) and other taxes arising out of the use and/or occupancy of the Shopping Center imposed by any taxing authority having jurisdiction over the Shopping Center, and shall include expenses and reasonable attorney's fees incurred by Landlord in contesting the validity or amount of any such taxes or assessments or in seeking a rebate of taxes or assessments.  Tenant shall also pay promptly when due or make reimbursement to Landlord for all taxes imposed upon Tenant's rent, lease and business operation, including without limitation, all sales taxes, value added taxes, documentary taxes, stamp taxes and other taxes assessed upon the consideration to be received by Landlord for this Lease, or upon the personal property of Tenant.

9.    **Insurance**.  Landlord's insurance obligations with respect to the Shopping Center and Tenant's contribution for such insurance shall be as follows:

    (i)    Landlord's Insurance. Landlord agrees to carry insurance under a Special Form Cause of Loss Policy (or an equivalent policy that becomes the insurance industry standard in the future) on the Shopping Center improvements in an amount equal to at least eighty percent (80%) of the insurable value of such improvements, together with endorsements insuring against such other risks as Landlord deems appropriate (including, but not limited to, earthquake, flood, boiler and machinery, plate glass, power failure, mold, windstorm, terrorism, seepage or leakage and loss of rent) and in such amounts, with such terms and with such insurers, all as Landlord deems appropriate in Landlord's sole discretion. Such insurance shall specifically exclude Tenant's personal property and the interior leasehold improvements, mechanical equipment and permanent fixtures that Tenant is obligated to maintain pursuant to the terms of the Lease. Landlord shall also maintain in full force and effect throughout the term of the Lease commercial general liability insurance with regard to the Common Areas with minimum limits of $1,000,000.00 per occurrence, $2,000,000.00 general aggregate, for bodily injury, death and property damage liability. Landlord shall have the right to carry its insurance under "blanket" and/or "umbrella" policies covering the Shopping Center and other properties. Any insurance policies maintained by Landlord may include deductibles, self-insured retentions or the like in amounts determined by Landlord, in Landlord's sole discretion. Landlord shall have the right, but not the obligation, to maintain commercial insurance policies covering some or all of the deductibles, self-insured retentions or the like which are provided in any of Landlord's other insurance policies. The insurance policies maintained by Landlord pursuant to this Section are individually and collectively referred to herein as "Landlord's Insurance." Tenant agrees that Tenant's contribution to the foregoing insurance shall be as provided for in the following paragraph and Tenant shall pay its proportionate share of Lessor's Insurance per said paragraph, which may include the cost of insuring or providing additional coverage for any deductibles; provided, however, that Tenant shall have no rights in said policy or policies maintained by Landlord and shall not, by reason of such reimbursement, be entitled to be a named insured thereunder.

    (ii)    Insurance Charge. Tenant agrees to pay Landlord the following amounts which collectively constitute Tenant's "Insurance Charge": (A) Tenant's proportionate share of the cost and expense of Landlord's Insurance, plus (B) Tenant's proportionate share of any deductible or self-insured retention actually paid in connection with Landlord's Insurance. Tenant agrees to pay to Landlord, in monthly installments, in advance on the first day of each month, Tenant's estimated Insurance Charge for Landlord's Insurance, including, but not limited to any coverage maintained by Landlord for deductibles or self-insured retentions as determined by Landlord in Landlord's sole discretion. For purposes of this paragraph, Tenant's proportionate share of Landlord's Insurance shall be determined by multiplying the total cost by a fraction, the numerator of such fraction being the square footage within the Premises and the denominator of such fraction being the gross leasable area of the Shopping Center as of the date hereof (or as may hereafter exist), excluding from the denominator the square footage of (i) any occupant in the Shopping Center who maintains property damage insurance on its building and/or commercial general liability insurance for the Common Areas within its parcel, (ii) any space which is not completely constructed and/or has not been initially leased and occupied by a Lessee, and (iii) that portion of the Shopping Center building(s) which cannot be reasonably leased and has been decommissioned by Landlord for reasons such as, but not limited to, lack of access, lack of reasonable visibility from the public right of way, and/or violations or lack of

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

**compliance with applicable building codes. Subsequent to the expiration of the period used by Landlord in estimating Tenant's proportionate share of Lessor's Insurance, Landlord shall furnish to Lessee a statement of the actual amount of Tenant's proportionate share of Landlord's Insurance for such period and within fifteen (15) days from receipt of Landlord's statement, Tenant shall pay to Landlord or Landlord shall remit to Tenant, as the case may be, the difference between the estimated amounts paid by Tenant and the actual amount of Tenant's Insurance Charge for** such period as shown by such statement. In the event Landlord maintains blanket and/or umbrella policies which insures premises or risks in addition to the Shopping Center or the rents therefrom, the statement of the insurer shall be conclusive as to the portion of the total premium attributable to the Shopping Center.  The term "Insurance Cost" shall mean Landlord's Insurance.

10.      Payment of Tenant Charges.  Landlord shall estimate the amounts that Tenant will owe for Operating Costs and Real Estate Taxes (collectively the "Tenant Charges") on the basis of periods of twelve (12) consecutive months as designated by Landlord, and Tenant shall pay one-twelfth of such estimate of Tenant Charges on a monthly basis in advance together with payment of Minimum Rent.  As of the Commencement Date, the estimated Tenant Charges shall be equal to the Estimated "Initial Tenant Charges" amount set forth in Section 1(l) above.  Landlord may revise the estimate of Tenant Charges from time to time and change Tenant's monthly estimated payment of Tenant Charges accordingly.  Landlord shall furnish Tenant annually (within one hundred eighty (180) days after the end of the applicable twelve (12) month period) with a statement of the actual Tenant Charges for the period in question, and there shall be an adjustment between Landlord and Tenant of Tenant Charges owed by Tenant for such period. Any amount owed to Landlord for an underpayment of the actual Tenant Charges shall be made within twenty (20) days after receipt by Tenant of the billing therefor.  Any overpayment shall be credited against Tenant's next payment of Tenant Charges.  Tenant Charges at the beginning or end of the Term for periods of less than twelve (12) full calendar months shall be appropriately adjusted by Landlord.

11.      Trade Fixtures.  Tenant agrees, at its own cost and expense, to fixture the Premises with new trade fixtures. All trade fixtures installed in the Premises by Tenant shall remain Tenant's property; provided, however that nothing herein shall be deemed to affect Landlord's remedy of distraint.  Tenant agrees to repair (or to reimburse Landlord for the cost of repairing) any damage to the Premises occasioned by the installation or removal of said trade fixtures. Equipment and fixtures that are an integral part of the operation of the Premises as a real estate unit generally, such as HVAC, plumbing, electrical and illumination equipment, or that are permanently installed in the Premises (such as built-in cabinets and/or wall-to-wall carpeting and/or window coverings) shall not be considered trade fixtures.

12.      Common Areas.  Tenant, and its customers, employees and invitees shall have the right to use and enjoy, in common with Landlord and other tenants and their customers, employees, and invitees, the parking areas, approaches, entrances, exits and roadways and all other areas of the Shopping Center, as they exist from time to time, intended for use by Landlord, tenants and their customers, employees and invitees (hereinafter collectively called the "Common Areas") which Landlord agrees to provide for the reasonable operation of the Shopping Center. It is expressly understood that the parking areas which are a part of the Common Areas are intended primarily for the use by customers of the stores in the Shopping Center, and Tenant accordingly agrees that its employees will only park in the portions of the Common Areas designated by Landlord for employee parking.

In order to assist Landlord in the enforcement of the provisions of this paragraph, Tenant agrees that within ten (10) days after being requested so to do, Tenant will furnish Landlord a written statement containing the names of all employees, agents and representatives employed by Tenant in or about the Premises, and the license numbers of all vehicles owned or used by Tenant or said employees, agents or representatives.  Landlord shall be entitled to tow away vehicles owned by Tenant or its employees which are parked in the Common Areas outside of the areas designated for employee parking and Tenant shall promptly pay the cost thereof.  Landlord will maintain the Common Areas in a good condition of repair and adequately lighted and paved and agrees that there will be at least the minimum number of parking spaces sufficient to satisfy governmental requirements at the time of the date of this Lease.  Anything in this paragraph to the contrary notwithstanding, Landlord expressly reserves the right, from time to time, to construct buildings and/or enlarge existing buildings on or over the Common Areas so long as such governmentally required number of parking spaces shall be available.

13.      Landlord's Repairs and Right of Entry.  Landlord covenants that it will, with reasonable dispatch after being notified in writing by Tenant of the need thereof, make such repairs to the Common Areas and outside utility lines and to the exterior of the Premises (including the roof, gutters, downspouts and outside walls, but excepting all glass and doors), as may be necessary to keep the same in a good condition of repair; provided, however, that if the need for such repair is occasioned by a casualty resulting from negligence or willful act of Tenant, or any of its agents, employees, or contractors, such repairs shall be made by Landlord, but the cost of such repairs shall be charged to and be promptly paid for by Tenant except to the extent that Landlord has waived claims with respect to such casualty pursuant to Section 20.  Tenant acknowledges that all ceiling tile replacements are Tenant's responsibility as they are a part of the interior of the Premises regardless of the source of damage. Anything in the foregoing to the

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

contrary notwithstanding, Landlord shall have no liability whatsoever for damage or injury to person or property occasioned by its failure to make any such repair (e. g., injury damage to property resulting from leaks caused by a defect in the roof, outside walls, gutters and/or downspouts) unless, within a reasonable time after being notified in writing by Tenant of the need therefor, Landlord shall have failed to make such repair and such failure shall not have been due to any cause beyond Landlord's control, including, without limitation, strikes and/or inability to obtain materials and/or equipment at reasonable prices.  Landlord, its agents (including Agent), employees and contractors, shall have the right, from time to time, to enter and use insofar as may be necessary the Premises for the purpose of making any of the aforesaid repairs.  Tenant shall not be entitled to any reduction in rent or to any claim for damages by reason of any inconvenience, annoyance, and/or injury to business arising out of any repairs made by Landlord pursuant to this Section.

14.      Tenant's Repairs.

(a)      Tenant covenants that Tenant will, at all times during the Term and at its own cost and expense, keep all portions, components or parts of the Premises that Landlord has not expressly agreed to maintain or repair (including, without limitation, the interior of the Premises, the heating system, air conditioning system, toilets, pipes, plumbing, wires and conduits, electric lines, ceiling tiles, windows, doors, glass, fixtures and equipment) in a good and safe condition of repair and in good working order (making such renewals and replacements as may be necessary).  Tenant understands and agrees that Tenant (not Landlord) shall be responsible for any damage caused by condensation in or around the duct work used for heating and/or air conditioning.  Tenant shall be responsible for any plumbing and other utility lines which serve the Premises exclusively (including, but not limited to plumbing and utility lines located beneath the floor slab) and for repairing any damage to space occupied by other tenants or the Common Areas caused by occurrences in the Premises, including, but not limited to, clogged plumbing lines.  Tenant agrees to obtain and maintain during the Term a heating and/or air conditioning maintenance contract, subject to Landlord's approval, which shall provide for a minimum of semi-annual unit inspection and preventative maintenance, and to provide Landlord with a copy thereof on commencement and renewal thereof.  Tenant agrees that it will, at all times during the term hereof, keep the Premises and all Common Areas (including sidewalks) adjoining the Premises clean and free from obstruction, rubbish, dirt, snow and ice.  Tenant shall place all trash, rubbish and garbage in a proper closed receptacle and shall pay all costs incident to the removal thereof if trash removal is not provided by Landlord.  Tenant agrees that if Tenant fails to perform any of its obligations under this Section, Landlord, in addition to other remedies provided by law and/or this Lease, may correct (or have corrected) the default at the cost and expense of Tenant.

(b)      If the doors, roof, window frames, glass or any part of the exterior of the Premises are damaged by persons breaking, or attempting to break, into the Premises, or by vandals, Tenant covenants to repair immediately at its own expense, any and all such damage.  Tenant agrees that Tenant will (i) not (directly or by sufferance) place any debris on the roof of the building of which the Premises constitute a part or cut, drive nails into or otherwise mutilate the roof or penetrate roof in any way without prior consent of Landlord, and (ii) not place anything on the roof of the Premises or the building of which it is a part without the written consent of Landlord.

15.      Miscellaneous Covenants of Tenant.

(a)      Tenant covenants that Tenant will:  (i) comply with all federal, state and/or municipal laws, ordinances and regulations relating to the Premises and the business conducted therein; (ii) be responsible for changing the locks of the Premises upon delivery of possession and provide Landlord with at least one duplicate key; (iii) upon delivery of possession,  put all utilities in Tenant's name and promptly pay for all electricity, gas, water and any other utilities consumed on the Premises, pay any and all connection or "tap" fees required for the establishment of utility service, and pay all sewage disposal charges assessed against the Premises; (vi) conduct its business in such manner as will be in keeping with the character and reputation of the Shopping Center; (vii) make every effort to work harmoniously with other tenants in the Shopping Center; (viii) comply with all reasonable rules and regulations promulgated from time to time by Landlord for the operation and advertising of the Shopping Center including but not limited to those set forth on Exhibit C to this Lease; (ix) not open or operate directly or indirectly a similar business within three (3) miles of the Premises; (x) not use the sidewalks of the Shopping Center for business purposes; (xi) not use or permit to be used any advertising medium or device such as a phonograph, radio or public address system that can be heard outside the Premises; or (xii) not hold a fire, bankruptcy, going out of business or auction sale (xiii) will comply with any written requirements per the Landlord's insurance company whether asked directly or indirectly through Landlord.  Tenant will permit Landlord or its representatives to enter the Premises during the last twelve (12) months of the Term for the purpose of exhibiting the Premises to prospective Tenants and to place a "For Rent" sign in a front show window during such period of time.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

(b) Tenant shall keep the Premises free from insects, pests and vermin of all kinds, and for that purpose Tenant shall use, at Tenant's cost, such pest extermination contractor as Landlord may reasonably direct and at such intervals as Landlord may reasonably require.

16. <u>Alterations</u>.  Tenant shall not make any alterations, whether exterior or interior, or structural or non-structural, to the Premises without Landlord's prior written approval, in its sole discretion, of the plans and specifications of the work to be performed and has satisfied Landlord's requirements for bonding, insurance and other contractor requirements.  All alterations and improvements shall be performed in a first-class manner.  In no event shall Tenant make any change to the Premises that alters the character of the Premises from a single retail entity, lessens the value of the Premises or violates any laws or other legal requirements or the provisions of any mortgage on the Shopping Center.  Work done by Tenant under the provisions of this paragraph shall not interfere with the use by other tenants of their premises in the Shopping Center.  Tenant agrees that it will, at all times during the term of this Lease, take any and all steps necessary to prevent the filing of mechanic's liens against the Premises in connection with work performed on behalf of Tenant, and if any such liens are filed, Tenant agrees to have same discharged by payment or bond within twenty (20) days after it was filed and if Tenant fails to do so, Tenant shall, without any requirement for prior notice by Landlord, be in default and, in addition to any other remedies that Landlord may have, Landlord may discharge the lien without inquiring as to the validity thereof and Tenant shall immediately reimburse Landlord for any amount so expended.

17. <u>Termination; Surrender</u>.

(a) Tenant covenants that it will, upon the expiration or earlier termination of this Lease, (i) deliver up to Landlord, peaceably and quietly, the Premises in the same good condition they are now in or shall hereafter be placed, ordinary wear and tear excepted (damage or deterioration to the Premises caused by Tenant's failure to perform its maintenance, repair and replacement obligations shall not be deemed to be ordinary wear and tear), and (ii) remove its trade fixtures and/or signage from the Premises (unless Tenant is then in default hereunder, in which event Tenant will not be permitted to effect such removal) and to repair promptly any damage caused by such removal, and (iii) deliver to Landlord a current HVAC preventive maintenance inspection report sixty (60) days prior to Tenant's expiration or early termination of this Lease.  In the event Tenant does not provide Landlord with an HVAC preventive maintenance inspection report within the aforementioned sixty (60) day period, or has not removed its signage from the Premises, the cost to repair the HVAC system and/or remove Tenant's signage will be at the expense of Tenant, and Tenant shall immediately reimburse Landlord for any amount so expended.  Final inspection by Landlord will be conducted prior to Tenant's move out and no utilities will be disconnected until final inspection has been performed and documented.  Tenant agrees to arrange such inspection with Landlord prior to Tenant's move out.

(b) Should the Tenant or any party claiming under Tenant hold over in possession at the expiration of the Term, such holding over shall not be deemed to extend the Term or renew this Lease, and such holding over shall be an unlawful detainer and such parties shall be subject to immediate eviction and removal.  Tenant shall pay upon demand to Landlord during any period while Tenant shall hold the Premises after expiration of the Term, as liquidated damages, a sum equal to one and one-half times the monthly rate of Minimum Rent and all additional rent in effect for the last month of the Term and Tenant shall also pay all damages consequential as well as direct, sustained by Landlord by reason of such holding over.

(c) Tenant agrees that all additions and other improvements installed in the Premises, including without limitation all electric wiring, electric fixtures, air conditioning systems, show window reflectors, screens, screen doors, awnings, awning frames, floor coverings and window treatments (including carpeting but excepting rugs) shall immediately become the property of Landlord, and shall not be removed by Tenant at the expiration or earlier termination of this Lease, unless Tenant is requested to do so by Landlord, in which event Tenant agrees to do so and to repair promptly any damage caused by any such removal and restore the Premises to its prior condition.

18. <u>Tenant's Indemnification, Liability and Casualty Insurance</u>.  Tenant agrees that it will indemnify, defend and hold Landlord, Agent and their respective agents, employees, members, partners and officers harmless from any and all liability for injury or damage to person or property in, on or about the Premises or the Common Areas immediately adjoining the Premises without regard to cause or fault, and all injury or damage occurring elsewhere in the Shopping Center as a result of the negligence or willful misconduct of Tenant, its agents, employees or contractors, and all costs, expenses, claims or suits arising in connection therewith.  The foregoing indemnity obligations shall survive the expiration or termination of this Lease.  Tenant covenants that it will, at all times during the term hereof, at its own cost and expense, carry commercial liability insurance on the Premises with an insurance carrier rated A or better by Best's Insurance Reports and licensed to conduct business in the state in which the Shopping Center is located (including Common Areas immediately adjoining the Premises) with combined single limit liability coverage of at least $1,000,000.00 per occurrence and $2,000,000 aggregate and including at least a $50,000.00 for fire legal or tenant's

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

legal liability insurance, which insurance shall name Landlord, Agent and any designee of Landlord as additional insureds and shall provide that such policy will not be canceled or coverage changed without at least thirty (30) days' prior written notice to the foregoing additional insureds.  Tenant's liability insurance policy shall include coverage for dram shop or host liquor liability if Tenant's business involves the serving of alcoholic beverages.  Tenant further covenants that it will, at all times during the Term, at its own cost and expense, carry plate glass insurance and insurance against damage by fire and other perils insured under a so-called "special" or "all-risk" policy, in an amount equal to the replacement value thereof with replacement cost coverage, on:  (1) all parts of the Premises for which Tenant is responsible under the terms of this Lease; and (2) Tenant's inventory, furniture, fixtures and equipment in the Premises.  Binding certificates (ACORD 27 or similar form) evidencing all of the insurance coverages required under this Section shall be delivered to Landlord prior to the commencement of the Term and at least thirty (30) days prior to the expiration of any such policy.  If Tenant fails to provide such insurance, Landlord may (but shall not be obligated to) obtain the same and collect the cost thereof as Rent.

The Tenant agrees that the above stated limits and coverages are minimum limits and coverages, and that Tenant shall provide such additional insurance as set forth above, in such amounts and against such risk as may be required in the Landlord's sole but reasonable judgment, to equal the amounts and types of coverages carried by prudent owners and operators of properties similar to the Shopping Center.  Tenant shall increase such limits at its discretion or upon reasonable request of Landlord and such increases shall not be in excess of generally accepted standards in the industry.

19.      Fire Insurance.  Landlord covenants that it will keep the Premises insured against damage covered under a standard fire insurance (or better) policy written with coverage in an amount not less than eighty percent (80%) of the replacement cost thereof.  Tenant covenants that, without the prior written consent of Landlord, Tenant will not do anything which will increase the rate of fire insurance on the building of which the Premises constitute a part, and that if such consent is given, Tenant will pay Landlord the full amount of the increase in the cost of such insurance, as and when the premiums become due.  Tenant agrees that it will, at Tenant's expense, comply with any mandatory preventive maintenance items required by insurance carriers, rating authorities, or public officials to minimize loss frequency and/or severity within the Premises.

20.      Release and Waiver of Subrogation.  Landlord and Tenant each release and discharge each other (as well as the officers, directors, members, partners, agents and employees of each other) from responsibility and liability (by way of subrogation or otherwise) for loss or damage to any building, structure or other property (real or personal) owned by the releasing party, or any resulting loss of income, that is an insured loss under the terms of the insurance policy(ies) of the releasing party or that involves a fire, casualty or other risk or loss required to be insured against under this Lease.  This release and discharge shall be applicable even though such loss or damage may have been caused by the negligence of the party hereby released.  Landlord and Tenant agree to include a waiver of subrogation endorsement or a provision permitting the insured to waive claims prospectively in each of their respective casualty insurance policies.

21.      Damage by Fire or Other Casualty.  In the event the Premises, or any part thereof, shall be damaged by fire or other casualty during the Term, Landlord agrees that it will restore the Premises, with reasonable dispatch, to substantially the same condition they were in prior to such damage, insofar as the proceeds from Landlord's insurance permit and provided that Landlord's mortgagee does not require insurance proceeds to be paid to it.  If the Premises are rendered wholly or partially untenantable as a result of such damage, the Minimum Rent payable hereunder shall be equitably abated (according to the loss of use) during the period intervening between the date of such damage and the date Landlord completes its required restoration of the Premises.  Anything in the foregoing to the contrary notwithstanding, if such damage occurs during the last two (2) years of the Term, and if such damage exceeds fifty percent (50%) of the then insurable value of the Premises, as determined by Landlord, either Landlord or Tenant may terminate this Lease as of the date of such damage, by giving to the other written notice of its intention to do so within thirty (30) days after the date such damage occurs; provided, however, that if this Lease gives Tenant an option to extend the Term and Tenant extends the Term of this Lease for at least five (5) years by exercising such option within thirty (30) days after the time such fire or other casualty occurs, neither Landlord nor Tenant shall have the right to cancel this Lease.  If this Lease is so terminated, the Rent payable hereunder shall be abated as of the date of such damage, and Tenant shall remove all of Tenant's property from the Premises within thirty (30) days after the notice of termination is given.  Anything in this Lease to the contrary notwithstanding, Landlord shall have the right to cancel this Lease as of the time of occurrence of any fire or other casualty, within sixty (60) days of such occurrence.  In the event that Landlord is obligated to restore the Premises after a casualty it may elect, by written notice to Tenant, to make such repairs to the Premises, or portion thereof which is damaged, necessary to put the Premises or the portion thereof which is damaged in the condition prior to such casualty.  Landlord, after paying for the work described in the preceding sentence, shall make the balance of any insurance proceeds received with respect to the Premises available to Tenant and Tenant shall be obligated to complete the restoration of the Premises, using its own funds to the extent that the insurance proceeds are insufficient.  Tenant shall have a period

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

of thirty (30) days to complete the work described in the preceding sentence prior to the cessation of any rent abatement after completion by Landlord of its work.

22.     Condemnation.  In the event that the whole of the Premises is taken by the exercise of the power of eminent domain (or sold to the holder of such power, pursuant to a threatened taking) this Lease shall terminate as of the date of such taking.  In the event any portion of the Premises are taken by the exercise of the power of eminent domain (or sold to the holder of such power, pursuant to a threatened taking), this Lease may, at the option of Landlord or Tenant, be terminated by written notice given to the other within sixty (60) days after such taking or sale occurs.  If this Lease is not so terminated, Landlord covenants that it will, at its own expense, promptly after the lapse of said sixty (60) days, repair such damage and do such work as may be required to repair and rebuild the Premises and/or the Common Areas, with the view to restoring the Premises and/or the Common Areas as nearly as may be to the condition they were in immediately prior to such taking; provided, however, that whether or not this Lease is so terminated, the Minimum Rent payable hereunder shall be equitably abated (according to the loss of use) from the date of such taking.  All compensation awarded for any taking of the Premises or the Shopping Center shall belong solely to and be the property of Landlord, and Tenant assigns to Landlord all of Tenant's rights with respect thereto and waives any claim Tenant may have with respect thereto, including any claim for Tenant's leasehold estate. However, Tenant may apply for reimbursement from the condemning authority (if permitted by law) for moving expenses, removal of Tenant's trade fixtures or loss of Tenant's business good will, provided that any such reimbursement shall not reduce the amount of the award otherwise recoverable from the condemning authority by Landlord.

23.     Assignment and Subletting.  Tenant shall not assign this Lease or sublet the Premises, in whole or part, without the prior written consent of Landlord. Prior to granting an assignment, an application must be completed by the intended Assignee and returned to Landlord with a non-refundable processing fee of $100.00. Upon approval of the applicant, an Assignment document will be created. Once the Assignment document is executed by the Assignor and Assignee it is to be returned to the Landlord along with any required payments including, but not limited to, the Assignment Fee of $2,500.00. Assignments requested within two years of execution of original Lease, other Assignments, and/or Amendments extending term will be subject to an additional fee of $500.00 per occurrence.  If such consent is granted by Landlord, Tenant will remain primarily liable for the performance of the covenants and obligations under this Lease binding upon Tenant (regardless of any subsequent amendment or modification of this Lease and regardless of any further assignment or subletting, all of which are hereby deemed to be consented to by Tenant and any Guarantor).  Each assignee must agree in writing to assume the obligations of Tenant under this Lease by an agreement satisfactory to Landlord and delivered to Landlord within ten (10) days after the date the lease assignment is executed.  Each subtenant must agree in writing (delivered to Landlord within ten (10) days after the sublease is executed) that Landlord may collect rent under the sublease directly from the subtenant if there is a default under this Lease and, at Landlord's option, agree to attorn to Landlord should this Lease be terminated.  The transfer of fifty percent (50%) or more of Tenant's stock, if Tenant is a corporation, or the transfer of a twenty-five percent (25%) partnership or other ownership interest in Tenant, if Tenant is a partnership or limited liability company (in either event whether in one transaction or as the result of more than one transaction), shall constitute an assignment under the terms of this Lease.  Landlord's consent to one assignment or subletting shall not waive the requirement that Landlord's consent be obtained for further assignments or subleases.  The acceptance by Landlord of the payment of any Rent following any assignment or sublease shall not be deemed to be a consent by Landlord to such transaction nor shall the same be deemed to waive any rights or remedies of Landlord under this Lease.  The restrictions of this Section shall be deemed to apply as well to any assignments of subleases and to any sub-subletting under any subleases.  If, at any time during the term, Landlord has knowledge that a person, firm or corporation other than Tenant is in possession of the Premises without the written consent of Landlord, Landlord may, at its option, at any time thereafter, by written notice to Tenant, accept and treat such person, firm or corporation in possession as the assignee of Tenant, in which event both Tenant and such assignee shall be obligated to observe and perform all the covenants, conditions and provisions herein contained binding upon Tenant provided; however, that nothing herein shall affect Landlord's other remedies for Tenant's default by wrongful assignment or subletting. Tenant agrees to pay Landlord's reasonable attorney's fees and related expenses, if any, incurred in connection with any proposed assignment or subletting, whether or not such proposed assignment or sublease is actually approved by Landlord.  Notwithstanding the foregoing, any and all amounts paid by any assignee or sublessee of Tenant in excess of amounts due to landlord hereunder as Monthly Minimum Rent and all other Rent whether paid to Tenant or to Landlord, shall be deemed additional rent hereunder and shall be remitted promptly to Landlord.  Landlord shall have the right to assign this Lease without Tenant's consent.

24.     Relocation.  Landlord shall have the right, at its sole option upon not less than thirty (30) days prior written notice to Tenant, to relocate Tenant and to substitute for the Premises described above other space in the Shopping Center of similar size.  Tenant shall execute an amendment to this Lease substituting the new premises for the Premises described in this Lease.  All other provisions of this Lease shall remain in full force and effect except that the Minimum Rent and Tenant's Fractional Share shall be recalculated based on the actual square footage of the new

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

space.  Tenant's failure to execute such amendment within fifteen (15) days of Landlord's demand that such amendment be executed or to vacate the Premises described above and occupy the new premises within thirty (30) days after Landlord notifies Tenant that it is ready for occupancy, shall be a default under this Lease.  It being understood that if the new premises are not ready for occupancy at the conclusion of said thirty (30) days, as a result of Landlord's actions, Tenant shall take possession and occupy the new premises within seven (7) days of notification by Landlord that the new premises are ready for occupancy. If Landlord and Tenant cannot agree on the New Space within sixty (60) days after Tenant's receipt of the Relocation Notice, then Landlord shall have the absolute right to (i) withdraw the Relocation Notice, and Tenant shall remain in the Premises pursuant to the terms of this Lease or to (ii) terminate this Lease ("Termination"), such termination being effective within thirty (30) days after Tenant's receipt of the Termination notice.  If this Lease shall be terminated pursuant to this section, the rights and obligations of the parties hereunder shall cease as of the Termination date and each party shall have no further obligation to one another, except for the adjustments and/or prorations of any monies owed to each other, as the case may be.  No further documentation shall be required to effect such termination of this Lease.

25.    Default and Remedies.

(a)    Defaults.  The occurrence of any one or more of the following events ("Defaults") shall constitute a default and breach of this Lease by Tenant:  (i) Tenant fails to pay any Minimum Rent when same is due under this Lease or fails to pay any other Rent payments, Tenant charges, or expenditures incurred by Landlord on behalf of Tenant and owed under this Lease within five (5) days of Landlord's demand therefor; (ii) Tenant fails to observe and perform any of the other terms, covenants and/or conditions of this Lease, and, unless the failure is of a type to which, pursuant to the provisions of the Lease, no cure period is applicable or no notice by Landlord is required, such failure shall continue for more than fifteen (15) days after written notice from Landlord to Tenant (however, if a default under this item (ii) cannot reasonably be cured within fifteen (15) days, and Tenant has promptly commenced the cure within such time and is diligently proceeding to complete the cure, then Tenant shall have such reasonable extra time (not to exceed sixty (60) days) to complete the cure); (iii) Tenant fails to pay when due Minimum Rent or any other Rent owed under this Lease three (3) or more times in any period of twelve (12) consecutive months; (iv) the Premises is abandoned, vacated or closed for business to the public (other than for fire, casualty or condemnation), or Tenant fails to open for business to the public in the Premises within thirty (30) days after the date on which Tenant is obligated to make its first payment of Minimum Rent; or (v) a case is commenced or a petition is filed by or against Tenant or any Guarantor under any chapter of the federal Bankruptcy Code, or there is filed by or against Tenant, or any successor tenant then in possession, or any Guarantor of this Lease, in any court pursuant to any statute or law, a petition for appointment of a trustee or receiver, an assignment for the benefit of creditors, or reorganization.

(b)    Remedies.  Upon the occurrence of a Default, Landlord, without notice to Tenant in any instance (except where expressly provided for below) may do any one or more of the following:  (i) apply the Security Deposit (if any) toward the satisfaction and cure of such Default; (ii) reenter the Premises, without terminating this Lease, and remove all persons and property from the Premises, by any suitable action or proceeding at law, or without judicial process if Landlord so elects, without being liable for any prosecution therefor or damages therefrom, and repossess and enjoy the Premises; (iii) elect to terminate this Lease upon not less than five (5) days written notice to Tenant, at which time the term of this Lease shall expire, but with Tenant's liability under all of the provisions of this Lease to continue; or (iv) exercise any other legal or equitable rights or remedies available to Landlord, including those additional rights set forth in this Lease.  In exercising any of the above remedies, Landlord may remove Tenant's property from the Premises and store the same at Tenant's expense without resort to legal process and without Landlord being deemed guilty of trespass or becoming liable for any loss or damage occasioned thereby, and Landlord may also sell such property at public or private sale, with the proceeds first being applied to costs of sale and storage (including reasonable attorney's fees) and then to amounts owed to Landlord under this Lease.  Tenant waives any rights to re-enter the Premises and any rights of redemption.  For each Default that occurs under subsection (a)(iv), Landlord shall be entitled to collect an amount equal to twenty-five percent (25%) of the Minimum Rent during such period of closure as liquidated damages in addition to all other sums to which Landlord may be entitled.  Landlord and Tenant agree that Landlord's damages for each such Default are not readily ascertainable and that such amount is a reasonable estimate of Landlord's damages and not a penalty.  Landlord's acceptance of liquidated damages as provided herein shall be in addition and supplemental to Landlord's right to seek specific performance against Tenant.  Tenant does hereby acknowledge that upon an uncured Default, the Landlord will have security interest in any property within the Premises.

Tenant understands that Landlord may re-let, in one or more leases, all or part of the Premises (or a premises including space in addition to the Premises), either in Landlord's own right or as agent for Tenant, accepting any rents then obtainable, for a term or terms that may be greater or less than the balance of the Term of this Lease, and Landlord may grant concessions or free rent without in any way affecting Tenant's liability for the Rent payable under this Lease.  However, Tenant understands that Landlord shall be under no duty to relet the Premises and that Tenant's liability under this Lease shall not be affected or diminished in any way whatsoever, for Landlord's failure to

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

re-let the Premises, or if the Premises are re-let, for Landlord's failure to collect the rentals under such re-letting. In connection with any re-letting, Landlord may make or do any alterations, repairs, painting and decorations ("Re-letting Preparations") to the Premises which Landlord considers advisable and necessary in its sole judgment, and such Re-letting Preparations shall not release Tenant from any liability under this Lease. Tenant understands that in the event of a Default, the Landlord may have cause to locate Tenant and does hereby authorize Landlord to utilize any information provided to the Landlord to do so.

(c)     Damages.   Tenant understands that in the event of a default, Landlord shall make Tenant liable for (i) all Rent and damages that may be due or sustained by Landlord up to the time this Lease terminates or Landlord takes possession of the Premises, whichever occurs later, and the performance of all other obligations of Tenant accruing under this Lease through such date (collectively "Accrued Damages")which accrued damages shall bear interest at the Default Rate until paid; (ii) all reasonable costs, fees and expenses (including without limitation attorney's fees and expenses, brokerage commissions and fees) incurred by Landlord in pursuit of its remedies under this Lease and in renting the Premises to others from time to time including, but not limited to Re-letting Preparations (all such Accrued Damages, costs, fees and expenses being referred to collectively as the "Default Damages"); and (iii) Future Damages, which, at the election of Landlord, shall be either:  (i) the amount (the "Deficiency") by which (A) the Rent reserved under this Lease until the expiration date of the Term exceeds (B) the amount of rent, if any, that Landlord shall receive during the same period from others to whom the Premises may be rented, from which Landlord may deduct all Default Damages owing to Landlord; such Deficiency to be paid in one lump sum payment upon demand by Landlord and shall bear interest at the Default Rate until paid or (ii) an amount equal to the present value of the sum of the Rent reserved under this Lease until the expiration date of the Term plus the Default Damages owed by Tenant, from which sum there shall be deducted the present value of the fair market rental value of the Premises as determined by an independent real estate appraiser designated by Landlord; Future Damages shall be payable to Landlord in one lump sum on demand and shall bear interest at the Default Rate until paid.

(d)     Remedies Cumulative.   All remedies of Landlord shall be cumulative.  Acceptance by Landlord of delinquent rent after Default shall not cure such Default nor entitle Tenant to possession of the Premises.

(e)     Attorney's Fees.   Tenant agrees to pay all costs incurred by Landlord on account of Tenant's default hereunder including, but not limited to, collection costs, court costs, and reasonable attorney's fees.

26.     Subordination.   This Lease shall be subject and subordinate to all ground or underlying leases and to any and all first mortgages and deeds of trust that may now or hereafter affect this Lease or the real property of which the Premises forms a part, and to all terms, provisions, renewals, modifications, consolidations, replacements and extensions thereof.  Tenant further agrees to attorn to any successor to Landlord's interest in the Premises, including any ground lessor or holder of a mortgage or deed of trust (the "Mortgagee"), or to any purchaser at foreclosure (or by deed in lieu of foreclosure) upon all of the terms and conditions of this Lease.  The foregoing subordination and attornment provisions shall be self-operative, but within ten (10) days after receipt of a written request therefor, Tenant agrees to execute promptly such agreements confirming the above subordination and attornment as requested from time to time by Landlord or the Mortgagee, and also agrees to enter into a subordination agreement with such other Mortgagees as Landlord may request, it being understood that the standard form subordination agreement then used by any Mortgagee shall be acceptable and executed without change.  Tenant further agrees to execute an agreement subordinating this Lease to junior mortgages and deeds of trust and providing for Tenant's attornment to the holder(s) thereof, upon the request of Landlord and upon the written consent of the beneficiaries of all mortgages or deeds of trust senior thereto.

Anything in the foregoing to the contrary notwithstanding, in the event of a foreclosure under any such mortgage or deed of trust, or the termination of any such ground lease, the holder of the note secured by such mortgage or deed of trust, the purchaser at such foreclosure sale or the Landlord under such ground lease shall have the option to recognize this Lease, in which event, this Lease shall continue in full force and effect and Tenant shall attorn to such holder or purchaser.  Any such mortgage or deed of trust may at any time, at the request of the holder of the note secured thereby, be subordinated to this Lease.  In no event shall any Mortgagee be (i) liable for any act or omission of Landlord or any subsequent landlord, (ii) subject to any offsets or defenses which Tenant might have against Landlord or any subsequent landlord, (iii) bound by any Rent which Tenant may have paid for more than the current month to Landlord or any subsequent landlord, (iv) bound by any amendment or modification of this Lease made without the Mortgagee's prior written consent, (v) bound by any obligations of Landlord to construct any improvements, or (vi) bound by any representations or warranties made by any prior landlord..

27.     Estoppel Certificate.   Within five (5) calendar days after receipt of a request therefor, Tenant agrees to deliver to Landlord and/or to any actual or prospective purchaser, mortgagee or other third party designated by Landlord a duly executed and acknowledged instrument certifying to Tenant's best knowledge (i) whether this Lease is in full force and effect (and if not, why), (ii) as to the existence of any default, (iii) whether there are any defenses,

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

counterclaims or offsets to such default, (iv) whether there has been any modification or amendment to this Lease, and (v) as to such other matters relating to this Lease or the Premises as may be reasonably requested.  Any such certificate may be relied upon by Landlord and by any other person to whom it has been exhibited or delivered, and the contents of the certificate shall be binding upon Tenant.  Tenant's failure or refusal to deliver such statement within such time shall be conclusive upon Tenant (i) that this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) that there are no uncured defaults in Landlord's performance or obligations hereunder, and (iii) that not more than one month's installment of Minimum Rent or other Rent has been paid in advance of the due date.

28.    Notices.  Any notice, request, demand, approval or consent given or required to be given under this Lease shall be in writing and shall be deemed to have been given if and when posted in the United States registered or certified mail, return receipt requested or delivered by a reputable national overnight courier, postage or fees prepaid or charged to the sender's account, and addressed to Landlord at Landlord's Mailing Address or addressed to Tenant at Tenant's Mailing Address.  Either party may at any time change its address for notice purposes by sending a notice to the other party advising of the new address.  Tenant also agrees to give the Mortgagee a copy of any notice of default sent to Landlord, provided that prior to such default Tenant has been notified in writing of the address of the Mortgagee.  Tenant shall not exercise any remedies available against Landlord unless Landlord's default is not cured within sixty (60) days after Mortgagee has received the foregoing notice (if the default cannot be reasonably cured within the 60 day period, then the Mortgagee shall have such reasonable additional time to cause the Landlord's default to be cured so long as the Landlord or the Mortgagee is diligently pursuing the remedies necessary to cure such default).

29.    Quiet Enjoyment.  Provided that Tenant has performed all of its obligations under this Lease, Landlord covenants that Tenant shall have and enjoy quiet and peaceable possession of the Premises during the Term free of molestation by Landlord, subject to the provisions of this Lease and of all mortgages, ground leases, encumbrances and other matters of record affecting title to the Shopping Center.

30.    Limitation of Landlord's Liability.  Landlord shall be liable for performance of its obligations hereunder only to the extent of Landlord's equity in the Shopping Center.  The respective partners, members, shareholders, officers, directors and managers of Landlord, their heirs, personal representatives, successors and assigns shall not be personally liable. The liability of Landlord shall not extend beyond the period of Landlord's ownership of the Shopping Center.  Furthermore, it is understood and agreed that in each and every instance in which Landlord's approval or consent is required under this Lease, Landlord shall have sole discretion to withhold such consent unless the specific provisions of this Lease with respect to such consent or approval provide otherwise.  Landlord shall not be liable for damages (whether direct, consequential or otherwise) by reason of its failure to grant such approval or consent.

31.    Signs.  Tenant shall install at its expense one exterior identification sign in conformity with the sign criteria of Landlord attached as Exhibit "D", or such other sign criteria as Landlord may hereafter promulgate in its reasonable business discretion. Except for this one exterior sign, Tenant agrees not to place any other sign, advertising matter or the like on the exterior of the Premises without Landlord's prior written consent.  Under no circumstances shall Tenant place any banners or any hand-lettered advertising on any window or door of the Premises or anywhere on the exterior of the Premises or on or above the canopy or walls of the building of which the Premises is a part.  All signs of Tenant shall be subject to and shall comply at all times with applicable governmental requirements.  No awnings or canopies shall be erected without Landlord's prior written consent, and Tenant shall not make any changes or modifications to its signage without Landlord's prior written approval.  Tenant agrees to maintain all signs in good condition and repair at its sole expense. Installing, changing or modifying any exterior sign without Landlord's written approval constitutes a performance default, subject to remedies contained herein. Upon the expiration or earlier termination of this Lease, Tenant shall remove its signage from the Premises and promptly repair any damage caused by such removal.

32.    No Waivers.  The failure of Landlord or Tenant to insist, in any one or more instances, upon strict performance by the other party of any covenant of this Lease shall not be construed as a waiver or relinquishment for the future of such covenant, but the same shall continue and remain in full force and effect.  The receipt by Landlord or its agent of Rent with knowledge of the breach of any covenant hereof shall not be deemed a waiver of such breach, and no waiver by Landlord or Tenant of any provision hereof shall be deemed to have been agreed upon unless expressed in writing signed by the parties hereto.

33.    Successors and Assigns.  This Lease and all the terms, covenants, conditions and provisions herein contained shall be binding upon and shall inure to the benefit of the parties hereto and their respective personal representatives, heirs, successors and (if and when assigned in accordance with the provisions hereof) assigns.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

34.      Other Provisions.

(a)      Entire Agreement; Modification.  This Lease represents the final understanding and agreement between Landlord and Tenant and incorporates all negotiations between the parties.  Tenant hereby acknowledges and agrees that Tenant has not relied on any representations, warranties, agreements and/or understandings, oral or written, except those that are set forth in this Lease, in entering into this Lease, and Tenant agrees that any and all negotiations, statements and representations made by Landlord, Agent or any other party on behalf of Landlord have been merged into and are superseded by this Lease.  This Lease cannot be modified except by a writing signed by all parties.

(b)      Interpretation.  The captions in this Lease are for the purposes of reference only and shall not limit or define the meaning of the provisions of this Lease.  References to any specific gender shall be deemed to include the other gender or neuter, as applicable; references to "expiration" shall include "termination" and vice-versa; and references to the singular shall include the plural, and vice-versa, all as the context may require.  If Tenant consists of multiple parties, the liability of such parties shall be joint and several, and the release of any one or more of such parties shall not affect the liability of any other party not expressly released in writing.  This Lease shall be governed by the laws of the state in which the Premises are located.

(c)      Waiver of Jury Trial and Homestead Exemption.  Landlord and Tenant hereby mutually waive any and all rights which either party may have to request a jury trial in any proceeding at law or in equity in any court of competent jurisdiction.  Tenant hereby waives the benefit of any homestead exemption available to Tenant with respect to this Lease.

(d)      No Broker.  Tenant warrants and represents that no agent, broker or finder was involved on its behalf in negotiating or consummating this Lease.  Tenant agrees to indemnify and hold Landlord harmless from any and all claims for brokerage commissions arising out of any communications or negotiations between Tenant and any broker (other than Agent) regarding the Premises, any other premises in the Shopping Center and/or the consummation of this Lease.

(e)      Short Form Lease.  Tenant agrees not to record this Lease.  However, upon the request of either party, the other party shall join in the execution of a "short form lease" for the purposes of recordation, including such terms of this Lease (other than economic terms) as are typically included in such document.  Either party may record such "short form lease" at its own expense.

(f)      Submission of Lease.  This Lease does not constitute an offer to lease, and Landlord and Tenant shall not be bound by this Lease until it is executed and unconditionally delivered by both parties.  This Lease may be executed in counterparts.  Each counterpart shall be deemed an original as to any party whose signature it bears and all such counterparts shall constitute one document. Delivery of said counterparts may be effectuated electronically. In the event this Agreement is electronically signed, the requirement for a notary signature is thereby waived, unless otherwise required by the state having jurisdiction.

(g)      Tenant Authority.  (i) If Tenant is a partnership, each person executing this Lease on behalf of Tenant warrants that Tenant is a validly existing partnership qualified to do business under the laws of the state in which the Shopping Center is located, that such partnership has the full right and authority to enter into this Lease and that no other partners other than those signing this Lease on behalf of Tenant must join in this execution; and (ii) if Tenant is a corporation, each person executing this Lease on behalf of Tenant hereby warrants that (1) Tenant is a duly constituted corporation qualified to do business and in good standing in the state in which the Shopping Center is located; (2) such corporation has the full right and authority to enter into this Lease, and (3) each person signing this Lease on behalf of the Tenant has been duly authorized by the board of directors of Tenant to execute and deliver this Lease on behalf of the corporation and that no other signatures are necessary.

(h)      No Representations by Landlord or Agent.  Tenant agrees that neither Landlord nor Agent has made any representation, express or implied, with respect to Federal, State or municipal laws or ordinances applicable to the Premises or the property of which the Premises constitute a part (including, without limitation, laws or ordinances relating to zoning or fire walls), and Tenant shall not have the right to terminate this Lease, nor shall he be entitled to any abatement of Rent payable hereunder or any claim for damages, in the event the Premises cannot be used by Tenant, in whole or in part, for the purpose for which Tenant intends to use the same.

(i)      Multiple Parties.  If Tenant is comprised of more than one person or entity, the liability of each such person and entity comprising Tenant shall be joint and several.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

35.     Contract of Landlord With Agent.  For services rendered by Agent in procuring this Lease, including any renewals, options and/or extensions, Landlord agrees that it will pay agent commissions pursuant to the terms of a separate agreement between Landlord and Agent.

36.     Hazardous Materials.

(a)     As used herein, the term "Hazardous Material" shall mean any substance or material which has been determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety or property, including all of those materials and substances designated as hazardous or toxic by the city or county and state in which the Premises are located, the U.S. Environmental Protection Agency, the Consumer Product Safety Commission, the Food and Drug Administration, or any other governmental agency now or hereafter authorized to regulate materials and substances in the environment.

(b)     Tenant agrees not to introduce any Hazardous Material in, on or adjacent to the Premises.  Tenant shall immediately notify Landlord of any inquiry, test, investigation, or enforcement proceeding by or against Landlord, Tenant or the Premises concerning a Hazardous Material.  Tenant acknowledges that Landlord, as the owner of the Premises, shall have the right, at its election, in its own name or as Tenant's agent, to negotiate, defend, approve and appeal, at Tenant's expense, any action taken or order issued with regard to a Hazardous Material by an applicable governmental authority.

(c)     If Tenant's stores, uses or disposes of any Hazardous Material in, on or adjacent to the Premises in violation of Paragraph B of this section of this Lease, such action shall constitute an event of default under this Lease. If Tenant's stores, uses or disposes of any Hazardous Material in, on or adjacent to the Premises and such action results in any contamination of the Premises, the soil or surface or groundwater requiring remediation under federal, state or local statutes, ordinances, regulations or policies, Tenant agrees to clean-up the contamination.  Tenant further agrees to indemnify, defend and hold Landlord harmless from and against any claims, suits, causes of action, costs, fees, including attorneys' fees and costs, arising out of or in connection with any clean-up work, inquiry or enforcement proceeding in connection therewith, and any Hazardous Materials currently or hereafter used, stored or disposed of by Tenant or its agents, employees, contractors or invitees on or about the Premises.

(d)     Notwithstanding any other right of entry granted to Landlord under this Lease, Landlord shall have the right to enter the Premises or to have consultants enter the Premises through the term of this Lease for the purpose of determining: (1) whether the Premises are in conformity with federal, state and local statutes, regulations, ordinances and policies, including those pertaining to the environmental condition of the Premises, (2) whether Tenant has complied with this Section, and (3) the corrective measures, if any, required of Tenant to remove Hazardous Materials.  Tenant agrees to provide access and reasonable assistance for such inspection.  Such inspections may include, but are not limited to, entering the Premises or adjacent property with drill rigs or other machinery for the purpose of obtaining laboratory samples.  Landlord shall not be limited in the number of such inspections during the term of this Lease.

Tenant shall reimburse Landlord for the cost of such inspections within ten (10) days of receipt of a written statement therefor.  If such consultants determine that the Premises are contaminated with Hazardous Materials, Tenant shall, in a timely manner, at its expense, remove such Hazardous Materials or otherwise comply with the recommendations of such consultants to the reasonable satisfaction of Landlord and any applicable governmental agencies.  The right granted to Landlord herein to inspect the Premises shall not create a duty on Landlord's part to inspect the Premises, or liability of Landlord for Tenant's use, storage or disposal of Hazardous Materials, it being understood that Tenant shall be solely responsible for all liability in connection therewith.

(e)     Tenant shall surrender the Premises to Landlord upon the expiration or earlier termination of this Lease free of Hazardous Materials and in a condition, which complies with all governmental statutes, ordinances, regulations and policies, recommendations of consultants hired by Landlord, and such other reasonable requirements as may be imposed by Landlord.  Tenant's obligations under this Section shall survive termination of this Lease.

37.     Compliance with Americans with Disabilities Act of 1990.  Tenant shall comply with all laws, rules and regulations in connection with the Americans with Disabilities Act of 1990, as amended (the "ADA").  Tenant acknowledges that it is a "public accommodation" as defined by the ADA.  If the ADA requires that action be taken with respect to the Premises, including without limitation removing barriers and altering the Premises in accordance with the ADA Accessibility Guidelines, such action shall be taken by Tenant.  Tenant shall notify Landlord immediately upon receipt of an oral or written complaint or notice by an employee, customer, client, invitee, licensee or governmental authority regarding a potential violation of the ADA.  Tenant shall indemnify and hold Landlord harmless from and against any expense or liability (including reasonable attorney's fees) arising from Tenant's failure to fully comply with this Section.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

38.    Agency and Ownership Disclosure.

(a)    Landlord and Tenant each acknowledge that, in connection with this Lease:

Initial One

   X          the Agent is representing the Landlord exclusively

or

_____          the Agent is representing the Landlord and Tenant, and Landlord and Tenant expressly consent to the Agent acting as a dual representative by their execution of this Lease and their review and execution of the attached Disclosure of Dual Representation.

(b)    Initial (if applicable):

_____          Agent and/or one or more brokers or salespersons of Agent has a direct or indirect ownership interest in Landlord.

39.    Lease Addendum and Exhibits.  Tenant agrees to comply with all Addenda and Exhibits to this Lease.  The following Exhibits are attached to this Lease and are fully incorporated into this Lease:

| Exhibit "A" | - | Site Plan |
| Exhibit "B" | - | Notice of Lease Term Dates |
| Exhibit "B-1" | - | Tenant and Landlord Responsibility Rider |
| Exhibit "C" | - | Rules and Regulations |
| Exhibit "D" | - | Sign Criteria |
| Exhibit "E" | - | Guaranty |
| Exhibit "F" | - | Percentage Rent Schedule |
| Exhibit "G" | - | Construction Criteria |
| Exhibit "G-1" | - | Tenant's Work |
| Exhibit "G-2" | - | Landlord's Work |

40.    Lease Guaranty.  Landlord's obligations under this Lease are conditioned upon receipt of a Guaranty of Lease in the form attached as Exhibit "E" executed by the Guarantor and receipt of satisfactory evidence of the authority of the Guarantor to execute the Guaranty of Lease.

41.    Rules and Regulations.  The rules and regulations attached to this Lease as Exhibit "C" shall be and are hereby made a part of this Lease.  Tenant, its employees, customers and guests shall perform and abide by such rules and regulations, and any amendments or additions to such rules and regulations as may be made from time to time by Landlord.

42.    Anti-Terrorism. Tenant represents and warrants that it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by the United States Treasury Department as a Specially Designated National and Blocked Person, or for or on behalf of any person, group, entity, or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and that it is not engaged in this Lease directly or indirectly on behalf of, or facilitating this Lease directly or indirectly on behalf of, any such person, group, entity, or nation.  Tenant agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including reasonable attorneys' fees and costs) arising from or related to any breach of the foregoing representation and warranty."

43.    Lender Approval Contingency.  Should Landlord be required, per Shopping Center loan documents, to submit this Lease to the Lender for approval, Landlord will submit a copy of this Lease with supporting Tenant financials for the Lender to review and approve.  If the Lender does not approve Tenant, or the terms of this Lease, then this Lease will become null and void and Landlord shall return the Security Deposit and prepaid Rent to Tenant within thirty (30) days of Lender's written disapproval notice.  Landlord will give Tenant written notice of approval, or disapproval, immediately upon receipt from Lender.

44.    **Intentionally Deleted.**

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

**45.     Force Majeure. Landlord shall not be held responsible for delays in the performance of its obligations hereunder when caused by pandemic, strikes, lockouts, labor disputes, acts of God, acts of terrorism, inability to obtain labor or materials or reasonable substitutes therefor, governmental restrictions, governmental regulations, governmental controls, delay in issuance of permits, enemy or hostile governmental action, civil commotion, fire or other casualty, and other causes beyond the reasonable control of Landlord.**

WITNESS the following signatures and seals:

## TENANT:

| | |
|---|---|
| By: | DocuSigned by: _____ 8347D560B2C14A7... |
| Name: | CHRISTOPHER COLLINS |
| Title: | Owner |
| Dated: | May 5, 2022 | 4:17 PM EDT |

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

LANDLORD:

<table>
<tr><td colspan="2"><b>WHLR–PIERPONT CENTER, LLC</b><br><b>a Delaware limited liability company</b></td></tr>
<tr><td><b>By:</b></td><td><b>Wheeler REIT, L.P.</b><br><b>a Virginia limited partnership</b></td></tr>
<tr><td><b>Its:</b></td><td><b>Sole Member</b></td></tr>
<tr><td><b>By:</b></td><td><b>Wheeler Real Estate Investment Trust, Inc.</b><br><b>a Maryland corporation</b></td></tr>
<tr><td><b>Its:</b></td><td><b>General Partner</b></td></tr>
<tr><td>By:</td><td>DocuSigned by:<br><i>M. A. Franklin</i><br>D8151F3C04154D9...</td></tr>
<tr><td>Name:</td><td><b>M. Andrew Franklin</b></td></tr>
<tr><td>Title:</td><td><b>Chief Executive Officer</b></td></tr>
<tr><td>Dated:</td><td>May 6, 2022 | 9:30 AM EDT</td></tr>
</table>

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# EXHIBIT "A"
## SITE PLAN



DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# EXHIBIT "B"
## SAMPLE FORM OF NOTICE OF LEASE TERM DATES

To: _____                 Date: _____

_____

RE:   Shopping Center Lease dated _____, 2022, between **WHLR–PIERPONT CENTER, LLC**, a Delaware limited liability company, Landlord, and **Davis Kitchen & Tile, LLC**, Tenant, concerning Store Number 3 (the "Premises"), located at Pierpont Centre Shopping Center, having an address of 601 Venture Dr., Morgantown, WV 26508.

Dear _____:

In accordance with the above referenced Lease, we wish to advise and/or confirm as follows:

1.    That the Premises have been accepted by Tenant as being substantially complete in accordance with the Lease, and that there is no deficiency in construction.

2.    That Tenant has accepted and is in possession of the Premises, and acknowledges that under the provisions of the Lease, the Term of the Lease is for _____, with _____ to renew for _____ each, and commenced upon the Commencement Date of _____, 20_____ is currently scheduled to expire on _____ sooner terminated pursuant to any provision of the Lease.

3.    That in accordance with the Lease, rental payment has commenced (or shall commence) on _____.

4.    If the Commencement Date of the Lease is other than the first day of the month, the first billing will contain a pro rata adjustment.  Each billing thereafter, with the exception of the final billing, shall be for the full amount of the monthly installment as provided for in the Lease.

5.    Rent is due and payable in advance on the first day of each and every month during the Term of the Lease. Your rent checks should be made payable to _____ at _____.

6.    The exact number of square feet within the Premises is _____ feet.

7.    Tenant hereby agrees and confirms that the responsibilities of Tenant and Landlord as set forth on the Rider to this notice of lease term dates accurately represents the responsibilities of Tenant and Landlord with respect to the Premises.

AGREED AND ACCEPTED

TENANT:     _____

By:             _____

Print Name:  _____

Its:             _____

By:             _____

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# EXHIBIT "B-1"
## Tenant and Landlord Responsibility Rider

Rider to Exhibit "B" to Shopping Center Lease dated _____, 2022, between **WHLR–PIERPONT CENTER, LLC**, a Delaware limited liability company, Landlord, and **Davis Kitchen & Tile, LLC**, a West Virginia limited liability company, Tenant, concerning Store Number 3 (the "Premises"), located at Pierpont Centre Shopping Center, having an address of 601 Venture Dr., Morgantown, WV 26508.

**Lease language pertaining to Repairs, Maintenance, Services, Operations: 4, 12, 13, 14, 15, 31**

| Service | Condition | Lease Reference |
|---|---|---|
| Delivery condition | | |
| Waste Removal | | |
| Waste Removal | | |
| Building Equipment | | |
| Fire Alarm Monitoring | | |
| Fire Panel | | |
| Fire Suppression / Sprinkler | | |
| HVAC Replacement | | |
| Utilities and Plumbing | | |
| Leased Premises | | |
| Ceiling Repair | | |
| Ceiling Tiles | | |
| Doors | | |
| Blinds and Sun Shades | | |
| Flooring | | |
| Electrical | | |
| Windows / Storefronts | | |
| Interior Lighting | | |
| Interior Painting | | |
| Plumbing incl beneath slab | | |
| Signage (building and storefront) | | |
| Wall repair | | |
| Fire Extinguishers | | |
| Building Exterior | | |
| Pylon Sign | | |
| Exterior Repairs & Maintenance | | |
| Parking Lot | | |
| Foundation / Concrete | | |
| Exterior Lighting | | |
| Exterior Painting | | |
| Structural | | |
| Roof | | |
| Landscaping | | |
| Snow Removal | | |
| Snow Removal | | |
| Window Cleaning | | |
| Reserved / Employee Parking | | |
| Outside Utility Lines | | |
| Doors - Premises | | |
| | | |
| HVAC PM | | |
| HVAC condensation damage | | |
| Pest Control | | |
| Grease Traps | | |
| Kitchen Hood / Exhaust | | |
| Refrigeration / Walk-In Coolers | | |

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

| Locks and Keys | | |
|---|---|---|
| Utilities | | |
| Electric | | |
| Gas | | |
| Sewer | | |
| Water | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# EXHIBIT "C"
# RULES AND REGULATIONS

1. All loading and unloading of merchandise, supplies and all other materials shall be done at such times, and such areas and through such entrances as may from time to time be designated by Landlord. However, Landlord will make every effort not to interfere with Tenant's loading and unloading, and Landlord will exercise its rights hereunder solely for the purpose of establishing and maintaining efficiency and smoothness of operation of the Shopping Center as a whole.

2. No radio or television aerial shall be erected on the roof or exterior walls of the Premises or on the grounds without the written consent of Landlord in each instance. Any aerial so installed without such written consent shall be subject to removal without notice at any time, and Tenant shall pay Landlord, on demand, the cost of such removal.

3. Tenant shall keep the Premises at a temperature sufficiently high to prevent freezing of water in pipes and fixtures.

4. The plumbing facilities shall not be used for any other purpose than for which they are constructed, and no foreign substance of any kind shall be thrown therein.

5. The following specifications shall be controlling for all signs:

   a. Design of the sign shall be approved by the owners of the Shopping Center prior to installation. Sign installation is required within sixty (60) days after Tenant's possession of the Premises.

   b. No sign shall be permanently affixed to the plate glass of the store front window without prior written consent of Landlord.

   c. Except during Shopping Center promotions, no sign shall be placed in any show window advising the public that merchandise is for sale at a reduced price without the prior written approval of Landlord. Landlord reserves the right to approve design and materials used.

6. The Shopping Center shall be heated by electric or gas furnaces, and no other gas, propane, kerosene, gasoline or other fuels shall be used for any purpose whatsoever in the Shopping Center.

7. Tenant shall install, maintain and keep in first-class order such fire extinguishers, placed in such locations in the Premises, as may be required by any city/county ordinance, state or federal statute or by any insurance company rating bureau which insures, or sets rates for insurance of, the Premises.

8. All trash must be kept in a covered metal container, or if requested by Landlord, in a Dumpsters or similar container furnished and serviced at Tenant's expense.

9. Tenant shall keep lights on in show windows and lights on under marquee, if any, from 10:00 a.m. until 9:00 P. M.

10. Tenant shall keep store lobbies, windows, and window frames clean (inside and out) at all times and wash them weekly.

11. Tenant shall keep store floors free of trash, chewing gum and other debris, and shall scrub and wax all tile or plastic flooring at least weekly.

12. Tenant shall operate its business in the Premises and take such preventive measure as shall be necessary to prevent any odors generated in the Premises from being detectable by persons in any other store space in the Shopping Center.

13. No banners

14. No tent signage

15. No smoking in any portion the Premises.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# EXHIBIT "D"
## SIGN CRITERIA

Signage on the exterior of the Premises shall be provided as herein specified and Tenant shall not erect or maintain, nor suffer to remain, any sign on the exterior of the Premises except as permitted herein:

(a)     Tenant shall, prior to commencement of the Term, erect one sign (the "Store Front Sign") on the front of the Premises.  The Store Front Sign shall not exceed twenty-four inches (24") in height and shall be approximately flush with the wall of the building to which such sign is affixed; the length of such sign including corporate crests, shields or insignia which may be permitted hereunder, shall not exceed seventy-five percent (75%) of the linear frontage of the Premises and shall in all cases be a minimum of two (2) feet from the center line of the wall dividing the Premises from the Premises adjacent thereto.  The Store Front Sign shall be individual pinned-on illuminated plastic-faced letters affixed to a raceway.  The returns on the side of the individual letters and the raceway shall be of a uniform color as designated by Landlord, if Landlord so elects.  All sign transformers, raceways and ballast boxes shall be concealed.  Manufacturer's names, stamps and decals shall not be exposed.  The forward projection of the Store Front Sign shall not be more than two inches (2") from the face of the building.  The wording on the Store Front Sign shall be limited to the name of the business conducted by Tenant on the Premises, provided that the use of corporate crests, shall be limited to the name of the business conducted by Tenant on the Premises, provided that the use of corporate crests, shields or insignia (subject to Landlord's prior written approval of specifications and drawings) may be permitted so long as corporate crests, shields or insignia shall not exceed twenty-four inches (24") in height.  The Store Front Sign shall be the only sign permitted at the front of the Premises.

(b)     No exposed neon or incandescent bulbs or flashing, blinking, rotating or moving signs, lights or markers shall be permitted in or on the Premises.

(c)     No Store Front Sign or other sign on the Premises shall be of type wherein the sign is housed or contained within an illuminated or non-illuminated sign can or box mounted on the exterior of the sign area.  All Signs shall receive Landlord's sole prior written approval before they are installed and shall be of the specific style and nature as approved by Landlord.

(d)     No signs will be permitted at or on the rear of the Premises except that a small identification sign showing only the name of the Tenant shall be lettered on the exterior of the delivery door by Tenant to Landlord's specifications.

(e)     No sign shall be painted on the exterior of the masonry, doors, windows or any other surface of the Premises, nor erected, maintained or suffered to remain on the roof or parapet of the Premises or under the awning canopy.

(f)     No sign shall be erected until written specifications (including but not limited to size, color, materials, etc.) and drawings of such sign have received the sole prior written approval of Landlord.  Such specifications and drawings shall be submitted to Landlord in quadruplicate and shall show the size, construction, materials, colors, script, name of sign manufacturer and proposed location of such sign in conformity with this Exhibit.

(g)     All signs erected by Tenant pursuant to the provisions hereto shall be erected at Tenant's own risk and expense (including final electrical connections, glass panels, glazing of such and internal lighting of such, any damage created and time clock) and/or reimbursement to Landlord for any and all work already completed by Landlord that is part of Tenant's sign panel i.e. glass panels, glazing of such and internal lighting of such.  However, Landlord is not obligated to perform any such stated signage work (glass panels, glazing and internal lighting).  Such reimbursement shall be paid immediately upon Landlord's execution of said Lease.  All signs shall be in accordance with applicable law and shall concern only the business of Tenant.  Tenant shall maintain said signs in a good state of repair and save the Landlord harmless from any loss, cost or damage as a result of the erection, maintenance, existence or removal of the same and Tenant shall repair any damage which may have been caused by the erection, existence, maintenance or removal of such signs.  Upon vacating the Premises, Tenant shall remove all such signs and repair all damage caused by such removal within five (5) days of said vacating or such work may be performed by Landlord at Tenant's sole expense.  Said expenses shall be due and payable by Tenant on demand including interest at the highest rate permitted by law.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

(h)     Installing any exterior sign without Landlord's written approval constitutes a performance default, subject to remedies contained herein. Upon the expiration or earlier termination of this Lease, Tenant shall remove its signage from the Premises and promptly repair any damage caused by such removal.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# EXHIBIT "E"
# GUARANTY OF LEASE

THIS GUARANTY OF LEASE made this date of _____ May 6, 2022 | 9:27 AM EDT _____, by **CHRISTOPHER COLLINS** (the "Guarantor"), to Landlord.

In consideration of and to induce the execution and delivery of this Lease, Guarantor hereby agrees as follows:

1.      Guarantor unconditionally guarantees to Landlord the full and punctual payment of all rents and other sums payable by Tenant under the Lease, and the full and punctual performance and observance of all terms, covenants and conditions on the part of Tenant to be performed and observed under the Lease (collectively the "Tenant Obligations"), including renewal options, holdover periods and periods prior to the commencement date under the Lease.  Guarantor further agrees to indemnify and hold Landlord harmless for any loss, liability, damage or expense (including reasonable attorney's fees) arising from the failure of Tenant to timely perform any of the Tenant Obligations and/or the enforcement of this Guaranty.  Upon Tenant's default under the Lease and upon demand by Landlord, Guarantor shall pay or perform the Tenant Obligations so in default, as applicable, without offset, deduction or counterclaim.

2.      This is a guaranty of payment and not of collection.  Landlord shall not be required to pursue any remedies that it may have against Tenant or pursue any security deposit or other security or other parties as a condition to the enforcement of this Guaranty, it being intended that Guarantor's obligations under this Guaranty shall be independent of, and in addition to, the Tenant Obligations.  It is understood and agreed that Guarantor may be joined in any action against Tenant and that recovery may be had against Guarantor in such action, or in any independent action against Guarantor.  This Guaranty shall not in any way be affected or impaired by reason of Landlord asserting against Tenant any rights or remedies reserved to the Landlord pursuant to the Lease, or available at law or in equity, including any termination of the Lease or re-entry into the Premises.

3.      Guarantor waives notice of any breach or default by Tenant under the Lease, notice of acceptance of this Guaranty, and all suretyship defenses generally.  The foregoing provisions shall apply without limitation to Landlord's waiver of or failure to enforce any Tenant Obligations and/or Landlord's granting extensions of time of performance to Tenant.

4.      This Guaranty shall be absolute and continuing.  The obligations and liability of Guarantor shall not be discharged, released, affected or impaired by:

(a)      Any change in the corporate existence, structure or ownership of Tenant, or any bankruptcy, insolvency, reorganization, liquidation, dissolution, winding up or other proceedings affecting Tenant, or the disaffirmance or rejection of the Lease in such proceedings, regardless of whether any or all of the foregoing is or are done or made with or without the consent of Guarantor or Landlord;

or

(b)      Any modification, amendment or other alteration of the Lease; any renewal or extension of the Lease; any assignment of the Lease or any sublease; any release of any other party liable for the Tenant Obligations or any release of security held by Landlord for the performance of the Tenant Obligations; or any sublease of all or a portion of the Premises; and Guarantor consents to any and all of the foregoing;

or

(c)      Any disability or other defense of Tenant, or the cessation from any other cause whatsoever of the liability of Tenant under the Lease.

The obligations and liability of Guarantor under this Guaranty shall continue in effect until all Tenant Obligations accruing during the term (including exercised renewal options and any holdover tenancy) of the Lease have been fully paid and satisfied.  If at any time payment of any of the Tenant Obligations is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Tenant, the obligations of the

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

Guarantor with respect to such payment shall be reinstated at such time as though such payment had not been made.

5.        Until all Tenant Obligations are fully paid and satisfied, Guarantor (a) shall have no right of subrogation against Tenant by reason of Guarantor's performance under this Guaranty or monies or obligations owed by Tenant to Guarantor, (b) waives any right to enforce any remedy which Guarantor now has or may hereafter have against Tenant by reason of Guarantor's performance under this Guaranty, and (c) subordinates any liability or indebtedness of Tenant now or hereafter held by or owed to Guarantor to the Tenant Obligations.

6.        In the event that this Guaranty shall be held ineffective or unenforceable by any court of competent jurisdiction, Guarantor shall be deemed to be a tenant under the Lease with the same force and effect as if Guarantor were expressly named as a joint tenant with Tenant.

7.        This Guaranty and the obligations of the Guarantor under this Guaranty shall not be modified, discharged, waived or terminated except by an agreement in writing signed by Guarantor and Landlord and approved by the beneficiary of the first deed of trust on the Premises.

8.        This Guaranty shall bind Guarantor and the heirs, personal representatives, successors and assigns of Guarantor.  This Guaranty may be freely assigned, transferred or hypothecated by Landlord and shall run in favor and inure to the benefit of Landlord, its successors and assigns, and each subsequent holder of Landlord's interest under the Lease.   References to the term "Tenant" shall be deemed to include Tenant's heirs, personal representatives, successors and assigns.

9.        This Guaranty shall be governed by and construed in accordance with the law of the state in which the Premises are located.  Guarantor agrees to be subject to the jurisdiction of the courts of such state, to accept service of process in any action brought in such state, and Guarantor waives any objection to personal jurisdiction in such action.  To the fullest extent permitted by law, Guarantor also waives all rights to a trial by jury in any action related to this Guaranty.  If this Guaranty is enforced by suit or otherwise or if Landlord exercises any of its remedies under the Lease, Guarantor shall reimburse Landlord, upon demand, for all reasonable expenses incurred in connection therewith, including reasonable attorney's fees.

10.       Notices to the Guarantor shall be sent by certified or registered mail to the address set forth in Section 1(n) of the Lease and shall be effective upon being deposited in the United States mail, postage prepaid.  Alternatively, notices may be sent by Federal Express or other recognized delivery service and shall be effective upon delivery to the above address.  Guarantor may change its address by giving written notice to Landlord in accordance with this provision.

11.       Guarantor represents and warrants that he or she has the legal right and capacity to execute this Guaranty. Guarantor waives the benefit of Guarantor's homestead exemption.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

WITNESS the following signature(s) and seal(s) as of the day and year first above written.

## GUARANTOR:

DocuSigned by:

_____

8347D560B2C44A7

Christopher Collins

SSN: ***-**-5557

Dated: ___May 6, 2022 | 9:27 AM EDT_____

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

EXHIBIT "F"
Intentionally Deleted

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

# EXHIBIT "G"
# CONSTRUCTION CRITERIA

1.	Except for the work for which Landlord shall be responsible (Landlord's Work), all work required to finish the Premises and to put the Premises in condition to open for business with the public shall be the obligation of Tenant (Tenant's Work).  Tenant's Work shall include, but shall not be limited to, the items set forth on Exhibit G-1 to the Lease.

2.	Tenant shall, at its expense, have plans and specifications for, and a description of, Tenant's Work (Tenant's Plans) prepared by Tenant and shall submit them to Landlord for its review.  Tenant's Plans shall conform in all respects with the plans for Landlord's Work, shall be in compliance with all applicable building codes and other laws and shall be otherwise satisfactory to Landlord.  Landlord shall notify Tenant, in writing, of its approval or disapproval of Tenant's Plans within ten (10) business days of receipt by Landlord, and if Landlord disapproves Tenant's Plans, the reasons for the disapproval.  The failure of Landlord to respond within such ten (10) business day period shall be deemed to be an approval of Tenant's Plans by Landlord.  In the event that Landlord disapproves Tenant's Plans, Tenant shall promptly cause them to be revised and resubmitted to Landlord for its approval and Landlord shall promptly respond to Tenant once Tenant's Plans, as revised, have been submitted to Landlord for review.  Once Tenant's Plans have been approved by Landlord, Tenant shall not revise or amend Tenant's Plans without Landlord's prior written consent. In the event Landlord is unable to deliver the Premises to Tenant by the Expected Delivery Date as a result of Tenant's failure to deliver to Landlord plans and specification required for Tenant's Work or for Landlord to complete Landlord's Work, or for any other hinderance caused by Tenant, the Commencement Date and Rent Commencement Date shall be calculated from the Expected Delivery Date and not the actual delivery of the Premises to Tenant by Landlord.

3.	Tenant may commence Tenant's Work upon fulfillment of all of the following conditions:

a.	Tenant's Plans have been approved by Landlord;

b.	A building permit and all other permits or approvals required by any governmental authority to be issued prior to the commencement of Tenant's Work shall have been issued by the appropriate authority and copies of same forwarded to Landlord;

c.	Tenant shall have provided, if necessary, satisfactory evidence that fire and casualty (including builder's risk), general liability and workmen's compensation insurance policies in amounts and in form and content satisfactory to Landlord have been issued and will be maintained throughout the course of the performance of Tenant's Work and that such certificates name Landlord and any other requested entities as additional insured;

d.	Landlord shall have approved the contractor Tenant intends to use, the contract between Tenant and such contractor, and the source, method, and amount of the financing for Tenant's Work; and

e.	Landlord has delivered possession of the Premises to Tenant (or has agreed to permit entry by Tenant and its contractors for the purpose of performing Tenant's Work).

4.	Tenant shall cause Tenant's Work to be diligently prosecuted and to be performed in a good and workmanlike manner in conformance with Tenant's Plans and all applicable building codes and other laws.  If Landlord permits Tenant to commence Tenant's Work prior to the completion of Landlord's Work, Landlord and Tenant shall work concurrently to have their respective work completed, it being understood, however, that Tenant's contractors shall not interfere with the work being performed by Landlord's contractors and that Landlord shall control access to the Premises.  With regard to Tenant's construction, during the period of construction, Tenant shall keep the Premises and the area surrounding it in a clean and orderly condition free from construction debris.  Landlord shall be responsible for cleaning with regard to its construction.

5.	Tenant agrees to indemnify and hold Landlord harmless from and against any and all liability, costs and expenses (including attorney's fees) due to personal injury, death, or property damage arising out of or resulting from any act or omission on the part of Tenant, Tenant's contractor, or his or its subcontractors or employees in the prosecution of Tenant's Work.

6.	During the course of the performance of Tenant's Work, Tenant shall keep the Premises and the property of which it is a part free of any mechanic's or materialmen's liens and if any such lien is filed and not

30

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

removed within twenty (20) days of its filing, Landlord may bond or pay the lien or claim for the account of Tenant without inquiring into the validity thereof.  Tenant shall promptly upon demand reimburse Landlord for any amounts so expended for its account and its failure to do so shall be, at Landlord's option, a breach of the Lease.  Within ten (10) business days of Landlord's request, Tenant shall submit to Landlord all final lien waivers from general contractors and subcontractors as well as a copy of the Certificate of Occupancy.

7. All terms used in this exhibit shall have the same meanings ascribed to them in the Lease. Tenant's possession of the Premises during the prosecution of Tenant's Work shall be subject to all of the terms and conditions of the Lease except for the payment of rent prior to the Rent Commencement Date.  Any conflict between the terms of the Lease and the terms of this exhibit shall be governed by the terms of this exhibit.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

## EXHIBIT "G-1"
## TENANT'S WORK

Tenant will have the right to construct its business interior per Tenant's specification at its own cost and expense with Landlord's prior written approval; approval not to be unreasonably withheld.  Prior to beginning work, Tenant shall submit to Landlord all plans, permits, certificates of insurance from contractors and general contractors naming Landlord and Wheeler Real Estate, LLC as additional insured.  Tenant shall submit to Landlord all final lien waivers and certificate of occupancy (CO) upon completion of Tenant's Work.

DocuSign Envelope ID: 75D0AC56-9987-41A0-912D-1C7D1347884D

EXHIBIT "G-2"
LANDLORD'S WORK

Tenant accepts the Premises in its present "as is" condition.